We'll hear argument first this morning in Case 17-16-18, Bostock v. Clayton County, and the consolidated case. Ms. Carlin. Thank you, Mr. Chief Justice, and may it please the Court. When an employer fires a male employee for dating men but does not fire female employees who date men, he violates Title VII. The employer has, in the words of Section 703a, discriminated against the man because he treats that man worse than women who want to do the same thing. And that discrimination is because of sex, again in the words of Section 703a, because the adverse employment action is based on the male employee's failure to conform to a particular expectation about how men should behave, namely that men should be attracted only to women and not to men. There is no analytic difference between this kind of discrimination and forms of discrimination that have been already recognized by every court to have addressed them. For example, discrimination against men who are effeminate rather than macho. Like the discrimination here, that discrimination is because of nonconformity with an expectation about how men should behave. The attempt to carve out discrimination against men for being gay from Title VII cannot be administered with either consistency or integrity. In the words of the en banc Second Circuit, it forces judges to resort to lexical bean-counting, where they count up the frequency of epithets such as fag, gay, queer, real man and femme to determine whether or not discrimination is based on sex or sexual orientation. That attempt is futile because when a man is discriminated against for being gay, he is discriminated against for not conforming to an expectation about how men should behave. Finally, the possibility that some employers, but not the employers here, may have policies of denying employment opportunities both to gay men and to lesbians does not change the unlawfulness of what was alleged by the employees here. Labeling those policies under an umbrella phrase like sexual orientation discrimination cannot hide the fact that such an employer is a double discriminator. It discriminates against men who do not conform to a male stereotype, and it discriminates against women who do not conform to an expectation about female. Ginsburg. Ms. Collin, how do you answer the argument that back in 1964 this could not have been in Congress's mind because in many States, male same-sex relations was a criminal offense, the American Psychiatric Association labeled homosexuality a mental illness? Well, I think you read the words of the statute, and this Court has recognized again and again forms of sex discrimination that were not in Congress's contemplation in 1964. In 1964, those were the days of madmen. So the idea that sexual harassment would have been reached. Most courts didn't find sexual harassment to be actionable until this Court did. In Price Waterhouse, this Court recognized that discrimination against a woman who cursed like a sailor, walked like a man, and didn't wear makeup was reachable under Title VII. If you had asked members of Congress then what they had thought, they would not have been thinking about women like Ann Hopkins. They said. Do you agree or disagree with Judge Posner's statement that the statute should be read to encompass sexual orientation discrimination to, quote, avoid placing the entire burden of updating old statutes on the legislative branch? I disagree with Judge Posner. I don't think you need to do any updating here. I think you should read the words as they were understood then, which is men and women. Title VII was intended to make sure that men were not disadvantaged relative to women and women were not disadvantaged relative to men. And when you tell two employees who come in, both of whom tell you they married their partner Bill last weekend, when you fire the male employee who married Bill and you give the female employee who married Bill a couple of days off so she can celebrate the joyous event, that's discrimination because of sex. Well, if no one has any further questions, I'll reserve the remainder of my time for a vote. Well, I think we'll have further questions. What do you do with the argument that this is a nondiscriminatory policy because it applies equally to relationships between women and relationships between men? In other words, your friends on the or you emphasize that you need to know the sex of the individuals involved before you can determine whether or not there's a violation, and that that brings it within Title VII. But what about the response that you do not need to know the sex of the people involved? You just have a policy against same sex. So you don't care whether the participants are women or men. If they're the same, then that's covered by the policy. I think that's no different than having a policy that says everyone should comply with the stereotype applicable to their sex. And if I can use an example from the Court's prior cases, for example, in Dothert v. Rollinson, the policy on its face said you cannot guard someone of the opposite sex. So a woman who seeks to guard a man is barred from that job. A man who seeks to guard a woman is barred from that job. Just put in, instead of the word guard, date, and you get the same kind of rule here, which is a man who wants to date a man can't do it, but a woman can. And a woman who wants to date a woman can't do it, but a man can. They are two forms of discrimination. Ginsburg. There's quite a difference. In Dothert's case, it was the disparate impact. There are many more male prisoners to guard than females, so that policy, even though it applied to men guarding women, it had a disproportionate effect on women who wanted to be guards because there were many more jobs guarding male prisoners than female prisoners. Justice Ginsburg, the part of Dothert v. Rollinson that rested on disparate impact was the height and weight requirements. The requirement about guarding the opposite sex was not a disparate impact. At most, the Court noted in a footnote along the way that there were more guard positions available to men, but it was not a disparate impact case. It was a disparate treatment case. And so a male person who had wanted to guard someone at the Julia Tutwiler prison, the prison for women in Alabama, would have had a claim that he had been discriminated against because of sex. Now, he would have lost that claim, but on BFOQ grounds, not on because of sex grounds. What do you do with the example that was brought up, that unlike race, there are certain distinctions that are not only permitted, but maybe even required between males and females, like physical fitness tests? So those — I want to answer that question in two parts. The first is to notice that in those cases, there is no question there is a differential between men and women. That is, men and women are being treated differently. What is at issue there is whether that differential treatment constitutes unlawful discrimination under Title VII. So, for example, in Johnson v. Santa Clara County Transportation Agency, everyone recognized Paul Johnson was denied the job because of his sex, but because it was a permissible affirmative action program, that was okay. In Dothert v. Rawlinson, this Court said, Ms. Rawlinson is discriminated against because of sex, but there's a BFOQ. So if Congress writes an exemption into the statute, that's one thing, but this Court really shouldn't be writing in an exemption for those purposes. Sotomayor, do you think we need exemptions for those BFOQs? It's not just the physical fitness standards for different sports, but the big issue right now raging the country is bathroom usage, same-sex bathroom usage. How are those cases going to be dealt with absent a congressional exemption other than BFOQ? Well, I think the way that they get dealt with is everybody agrees if you have men's bathrooms and women's bathrooms, that's because of sex. It treats men one way, it says go to this bathroom. It treats women another way, it says go to this bathroom. Then the question becomes, is that permissible to do? And if I could just begin with an example that I think will show why this is so. When I got up, the Chief Justice said to me, Ms. Carlin, I am willing to bet any amount of money I have that when Mr. Harris gets up, he's going to say, Mr. Harris, he has treated us differently because of sex, but that's not discriminatory because neither of us has been subjected to a disadvantage. And as this Court said in Burlington Northern Against White, what the statute means when it says discriminate against is to cause an injury. And requiring people generally to use separate bathrooms is not an injury. Well, I'm not sure that may be how they would see it, and to what extent should we take that into account? And same thing with gender-specific uniform requirements. Sure. How would you deal with those, given that at least those affected might think that they're suffering a harm? So there's no categorical rule about these. For example, the fact that all of the men sitting at counsel table knew that they had to wear ties today and I was free not to didn't cause an injury. On the other hand, even the dissenters in the Second Circuit said, if the Court said women who come to argue should argue in hooters outfits and the men should wear ties. We're not, we're not. I mean, we can talk absurd examples, but we can talk real-world examples. No, but I can give you a real-world example, which is it probably doesn't violate the dress code to require men and women and business events for the women to wear skirts. But if you required a female telephone lineman to wear a skirt while she's talking. I understand that. That's not what I'm getting at. And you know what I'm getting at. The funeral homes example is not a bad example. The case that we're about to take up is more in the realm of my question. Okay. You can offer me help if you want to.  No, I'm trying to offer you help. What I'm trying to say. What I'm suggesting, counsel, is that there are male and female bathrooms. There are dress codes that are otherwise innocuous. Most people would find them innocuous. But the affected communities will not. And they will find harm. And how does your test deal with that one way or the other? That's what I'm asking you to address, if you'd like to. Yes. My test says that you have treated the people differently because of sex, which is what we are asking you to hold here. When you treat a gay man who wants to date a woman differently than a woman who wants to date a woman, that's discrimination. Then you get to what I've said, which is you have to ask whether a reasonable person under these circumstances would be injured by the imposition of the particular sex-specific. So when the Chief Justice calls me Ms., I am not injured. When I go to a ‑‑ You are not, but another person might be. Right. And are they reasonable or not? And I'm just ‑‑ I'm wondering, how do you decide those cases? An idiosyncratic preference does not void an otherwise valid dress code or bathroom rule. I'm sorry. I apologize. Is it idiosyncratic for a transgender person to prefer a bathroom that's different than the one of their biological sex? Is it idiosyncratic for a transsexual person to wish to dress in a different style of dress than his or her biological sex? No. Okay. So the answer to your question is, the question then, at the end of the day, if I understand it, is that those are acts of discrimination under Title VII, as you understand it. Yes, although I think you would be better advised to ask the question to someone who is representing someone who is transgender. I'm representing someone who is gay. Ms. Carlin. Yeah. But you're begging Justice Gorsuch's question. We were following up on the same point. I truly am not trying to beg the question. Which is, how do we differentiate the two? What is the legal test that you propose to say, this is discrimination because of sex, as you said, calling you one thing and your friend another is discriminatory. But it's okay because there's no harm. So what's the test we apply to say when it is harm and when it isn't? Let me try to be clear. It's not discrimination to call me Ms. Carlin and to call Mr. Harris Mr. Harris. It is because of sex that we were treated differently. But as this Court has made it clear several times, discrimination consists in an effect that the law is prepared to recognize. And generally, across all statutes, this isn't under Title VII, and this is why I'm really not begging the question here. The Court has said de minimis effects are exempted from statutes presumptively. So if this Court thinks, or if another Court thinks So why is the dress code for hooters that requires all women to wear a scantily a scant dress, is that discriminatory? Yes, it is. Is it discriminatory for the woman who just doesn't want to wear it because it's demeaning? Yes, it is. So how about is it discriminatory for the restaurant not to hire a transgender man who wants to wear the uniform? The scant uniform. I mean, I do want to get to the question of sexual orientation here, but I understand. Sotomayor, what you're alluding is, and I still haven't heard the explanation, which is the question of how do we tell what's actionable and not? When does that discrimination become actionable? I'll give an analogy from the race area that may be helpful to the Court, which is for many years there was an argument that separate but equal was acceptable. And ultimately, this Court concluded that when it came to race, separate but equal was not permissible. I don't think the Court has held anything like that with regard to sex. But you're going to have to answer that question about dress codes regardless of how you rule in either my case or in Ms. Stevens' case. Ginsburg. Can I just say the test is, is the person injured? Yes, it's a differential based on gender, but most people are not injured by having separate bathrooms. In fact, most people would prefer it. So are you saying that we have to wait for the testing case for the person who might be injured by not being allowed to use the bathroom of the other sex? I think it highly unlikely you're going to see cases like that. The bathroom issue has been around since the beginning of Title VII. Title VII has a special provision in 703A2 that says when you segregate people, the question is whether that segregation denies them employment opportunities. And it's hard to see, quite honestly, how requiring men to use a men's room and women to use a women's room denies them employment opportunities. Justice Alito. May I ask you to respond to what some people will say about this Court if we rule in your favor? And what they will say is that whether Title VII should prohibit discrimination on the basis of sexual orientation is a big policy issue, and it is a different policy issue from the one that Congress thought it was addressing in 1964. And Congress has been asked repeatedly in the years since 1964 to address this question. The Equality Act is before Congress right now. Congress has declined or failed to act on these requests. And if the Court takes this up and interprets this 1964 statute to prohibit discrimination based on sexual orientation, we will be acting exactly like a legislature. We might as well just take the Equality Act and issue that as our opinion and say, as Judge Posner said, that the courts need to intervene on questions like this when the legislative branch simply will not do so. What would we — how would we respond to that question? Well, the fact that a loose canon like Judge Posner says, do whatever you feel like, is not what we are asking for. We're saying if you read the words, because of sex, and you ask, in 1964, what did those words mean? They meant treating men differently from women. So if in 1964 it would be discrimination to fire a woman who wanted to — you know, a woman who enjoyed sewing. And there's a famous case, it's the foundational case on sexual orientation, where they fired a man who said his hobby was sewing. We would not be deciding a major policy question that was not in Congress's mind in 1964 and that Congress has repeatedly failed to address in the years since then. No more than what you did in Encal, no more than what you did in Pricewaterhouse, no more than what you did in Newport. Breyer. In my mind, there are three basic parts to this case on the other side. The language, you've dealt with that. The parade of horribles, you've dealt with that. And the third one is the one that Alito is bringing up in one form. As it comes out of the — out of the briefs, as I read it in your opponent's brief, I would put it in these terms. Imagine a statute that says policemen, dah, dah, dah, must pay damages. Passed a long time ago. That doesn't apply to German policemen. Kagan. Doesn't apply to what? Breyer. To German policemen. The meaning is the same. German policemen are policemen. But the statute doesn't apply to them. How do we know? Well, we know through a lot of history, dah, dah, dah. Okay? Now, that's the box in which I put the argument that Justice Alito made. It's a serious legal argument. And the argument is that at the time, Congress wouldn't have dreamt of this. And therefore, the words, though they apply, they meant to exclude the gays and transgender. Now, what I need to hear is a clear answer to that question. I think the way to think about this is to ask about the specific behavior that's at issue, which is a man dates a man. And then ask, how does that fit within the language? And the best example I can give you It fits. I give you it fits. No. I'm about to explain why it fits, which is the idea was that people should not be denied jobs that they are qualified to do. Award-winning advocates for child services like Gerald Bostic should not be denied a job because they are a man who does something that, if they were a woman, would cause no problems at all. So just to give an example from the first sex discrimination case this Court had, which was the Phillips v. Martin Marietta case, a woman who has children at home should not be denied a job that a man who has children at home. Now, all you have to do is say those words apply also if it is a woman who has a wife at home rather than children. Several, I think about 23 States, have been passing laws to address these issues. And I don't know how many of them, but I think it's a big part of them. When they do extend the coverage against discrimination on the basis of sex to sexual orientation, they also include an exemption for religious organizations. Now, if we are going to be extending the understanding of what sex encompasses and I know your argument that that's not doing that, how do we address that other concern that at least I think almost every State legislature that has extended it has felt compelled to address? Well, I would say three things about that. The first is this Court has already created an exemption for sincere religious belief for a large category of employers through the ministerial exception. The second is that Congress balanced these issues and has rebalanced them several times in the co-religionist exception. The third thing I would say is to understand this in context, which is 85 percent of American employers are not covered by Title VII at all. So as to those employers, if they have religious objections to hiring someone who's gay, they're free to continue doing that. And the fourth is to make it very clear that the question is not whether people have religious objections to homosexuality. It's whether they have religious objections to hiring someone who is gay or lesbian. And there are many employers whose own religious beliefs would tell them this would be immoral for them who have no problem hiring gays and lesbians who are qualified to do a job. If I could just ask the Court to do one thing in thinking back to 1964, it is to look at the two foundational opinions on which everybody has played a game of telephone ever since. It's like your opinion last term in Argus Media where you asked where did the idea that homosexuality wasn't covered come from? It came from first a case where a gay black man said he was being treated worse than gay white men. It wasn't even a sexual discrimination case. The second one came from a straight man who was fired because he was denied a job because he said his hobby was sewing. And the employer said that's an effeminate hobby, so I bet you're gay. If you look at the reasoning in those cases, you will realize that it was not until Hively that any court did a careful reading of the statute using contemporaneous methods of textual interpretation. And since then, a majority of justices, I mean, a majority of judges have held that it's discrimination. Justice Breyer characterized what I said earlier as conceding that sexual orientation discrimination fits the words of Title VII, but that we should take a broader view of what Congress had in mind. But that was not the premise of my argument. In your core, the parties have, in their briefs, have all of these comparisons and they will make your head spin. If you try to figure them all out. But let me just go to your core one, which you began with today. A man is attracted to other men. He's fired, let's say. A woman is attracted to men. She is not fired. You say that's all you need to look at. That's discrimination on the basis of sex, right? Yes. Okay. That's not correct because there are two possible explanations for what happened there. It could be based on sexual orientation or it could just be based on the fact that the employer wants, does not want to hire men. Now, if you add in two other cases, a man who is attracted to women, not fired, a woman who's attracted to women is fired, then you have a much better idea of the basis for the discrimination. And it's sexual orientation. It's not sex. But in a case like the two cases before this Court where the employer had hired these men and they were already there, the supposition you made in your question doesn't apply, which is we know this is an employer who's willing to hire men. Indeed, the employer in Gerald, I mean, the employer in Donzardo's case had only men as skydiving instructors. So when he fires a man who wants to date a woman and he, I mean, a man who wants to date a man and he does not fire a woman who wants to date a man. The point is that discrimination on the basis of sex in the sense that Congress understood it in 1964 is a different concept from discrimination on the basis of sexual orientation. And that's what you're fighting. You're trying to change the meaning of what Congress understood sex to mean and what everybody understood sex to mean in 1964. I'm not trying to change that at all. I'm simply saying that if a man and a woman both wanted to sew and you fire the man who loves sewing and you don't fire the woman who loves sewing, that's discrimination, pure and simple sex discrimination. If you fire, if you fire the man who loves, thank you. Thank you, counsel. Counsel? Mr. Chief Justice, and may it please the court. Touche. In 1982, Wisconsin became the first state in the country to pass a law banning discrimination because of sexual orientation in private employment. The proponents of that law celebrated its passage as a landmark achievement for gay rights. According to the plaintiffs here, however, Wisconsin's landmark law actually had little, if any, practical impact because Congress had already banned sexual orientation discrimination nationwide 18 years earlier in the Civil Rights Act of 1964. To quote Judge Lynch's dissent below, Congress did no such thing. Sex and sexual orientation are independent and distinct characteristics and sexual orientation discrimination by itself does not constitute discrimination because of sex under Title VII. That's just as true today as it was in 1964. The core error in the Second Circuit's holding is actually quite similar to the error that led this Court to reverse in Oncal. In Oncal, the Fifth Circuit had held that same-sex harassment claims were categorically excluded from Title VII. This Court correctly reversed and held that such claims may well be cognizable as long as the plaintiff meets all requirements of the statute, especially what this Court called the, quote, critical inquiry into whether members of one sex were being treated worse than members of the other sex. This case is just the mirror image of Oncal. Whereas the lower courts in Oncal adopted a categorical exclusion, the Second Circuit adopted a rule of per se inclusion in which plaintiffs alleging sexual orientation discrimination receive a free pass around the critical inquiry into whether men and women are being treated differently because of their sex. In short, the Second Circuit simply changed the ultimate question from sex to sexual orientation, but because both men and women may have same-sex attractions or partners, a standalone allegation of sexual orientation discrimination cannot without more show discriminatory treatment. Sotomayor, can I understand your argument in context? Let's answer the question. The employer looks at a man who applies and says, one of my hobbies is sewing. And the employer says, that's an effeminate hobby. You may be gay. I'm not hiring you. So is that a mixed motive case? And are we going to be trying somehow to parse that there's some sort of substantial legal difference between the belief that you're too effeminate or that a lesbian is too macho, whichever, from you're attracted to the other sex? How do you tease that out? Justice Sotomayor, I don't disagree that there will be tough cases at the margins, but the problem with what the Second Circuit did is they glossed over those hard questions and said, we're just going to adopt a per se rule that if you show. Sotomayor, aren't you glossing over the BFOQ? Meaning, what it seems like you're confusing is three concepts. Title VII has causation and injury. Not hiring, not firing, that's the injury. Now the question is, what caused that? Being too effeminate, that's a sexual trait. Being attracted to, if you're a man, to another man, that's a sexual trait. It's caused by those two things. Aren't then we moving to the third question, which is, is there a reason independent of your religious belief or your innate hatred and invidious discrimination for why you're treating this person differently? And if there is, you have a BFOQ. You don't have to hire them. You can fire them. But if there isn't, and they're doing their job, and they're not bothering you, and they're not bringing their boyfriend or girlfriend, if it's the opposite sex, to a function to your private home because you don't want them there, or whatever else is offensive to you, they're just working. So I don't understand why those are hard cases. Any harder than what the law applies for race discrimination, for religious discrimination, for any of the other forms, national origin discrimination. So, Your Honor, as this Court has emphasized in cases such as Johnson Controls, the BFOQ exception has been interpreted extremely narrowly. And so I think it is important, as this Court emphasized in Oncal, the Court emphasized several times the need to ensure strict compliance with all requirements of the statute, including the discrimination element, because once you find discrimination, it gets very hard to make out the BFOQ. So I don't think the BFOQ should be used. Ginsburg. Would Oncal have come out differently if the employer said, I don't hire women to work on platforms. The only people I hire are men. Well, that obviously would have been discriminatory against the women seeking. But it's not the woman who's suing. It's the male who is being harassed by other men. And the employer's defense is, you can't compare what I'm doing to someone who discriminates on the basis of sex between men and women, because I don't hire women at all. So it's, of course, it's not a complete defense or even a defense to say, I treat it. In cases like Martin Marietta, it was not a defense for that employer to say, because I hired other women, it excuses this.  Martin Marietta was different, because it was the plus. The plus applied to women and didn't apply to men. So you had that distinction. Well, take Price Waterhouse. Suppose the employer said, I don't want any men who are not sufficiently macho, and I don't want any women who are not sufficiently feminine. If they, the Price Waterhouse said, we'll treat a man who isn't sufficiently macho the same way we treated Ann Hopkins, there would be, as I understand your argument, no sex discrimination. I disagree with that, Justice Ginsburg. The way, I think the best way to think of Price Waterhouse is, when an employer has certain traits or characteristics that it values in promotion, in hiring, in discharge decisions, there can't be a list of criteria for men and a list of criteria for women. So the Solicitor General offered the hypothetical that Your Honor said, and in that situation, there would be two sets of criteria. And so maybe both a man who doesn't meet the women's criteria and a woman who doesn't meet the men's criteria would have a claim there. But it wouldn't be, it would not excuse it just to say that there are different criteria for each sex. Suppose Catholic, Jew, want to get married. Employer? Fires the Catholic. Why? He's not against Catholics. He's against intermarriage. And obviously, I can use the same example with race, which is famous. I take it from your argument that there would be no claim. There would, in fact, be a claim in both situations. Why? Why? Why? All right. If there is a claim there, why isn't there here? So in the race context, the only difference between the two. I didn't say race. I said religion. In the context of religion, which, first of all, religion is defined as is the only one other than pregnancy, which has an expansive definition. Yes, it would be religious discrimination because between a couple that is Catholic and Jewish and two Catholics, the only difference between those couples is their religion. And the only difference between the two couples here is that one is a man rather than the woman.  neutral to the man. Who does it there? I am not against Catholics. I am not against Jews. I am against intermarriage. If that person or actor exists, I think it's foreign to our case law. It exists, I promise you. There are many people, at least in the religious context, who are against intermarriage and are not against Catholics or Jews. That's not an unrealistic example. And all I find in that example is an identical case to this one. I do think that most people who would oppose any sort of interreligious marriage would do so for religious reasons. And I would also note in these associations. Kagan. Mr. Harris, I think what all of these hypotheticals are about is that in many of our cases, what you find is what you said, what did you say, independent characteristics. They're all over our cases. If you take Manhart, which is the seminal case, Manhart was all about an independent characteristic. It was about life expectancy. But we didn't say, oh, we're going into some different sort of analysis where we don't just say would the same thing have happened to you if you were a man or would the same thing have happened to you if you were a woman because we had an independent characteristic, which was life expectancy. And so the same thing here. So all of these hypotheticals are really about the same thing, which is that Manhart gave us a very simple test. And Manhart said what you do when you look to see whether there is discrimination under Title VII is you say would the same thing have happened to you if you were of a different sex. And Ms. Carlin made all the, you know, went through all the ways in which obviously the same thing would not have happened to you if you were a different sex, you being her client. So, I mean, that's the question. There are independent characteristics in all these cases. We have insisted on this extremely simple test. If you apply that test, I guess it seems to come out against you. First let me address Manhart and then address the test more generally. So in Manhart, this Court noted that the policy wasn't just about longevity. That employer made no attempt to do any sort of bona fide underwriting or life expectancy estimates. It simply charged the women more. So even a woman and a man, if they each had a 75-year life expectancy, they would be charged different rates, even though they were totally similarly situated with respect to them. Kagan. But Manhart was very clear that women in the aggregate were probably going to be fine under this policy, because women in the aggregate do have a higher life expectancy. I mean, I think actually Manhart makes clear why another aspect of your argument is wrong, because you say, well, we have to look at these big classes. Well, there was nothing wrong in Manhart when you looked at big classes. What became wrong in Manhart was when you looked at individuals. And when you look at individuals, which Manhart insisted one should do, and when you apply the test that Manhart insisted you apply, would this woman have been treated differently if she were a man? The answer was yes. And similarly, I guess I'm just going to ask you again, if you apply that test, don't you lose? And if you do lose, why should we not apply that test? Here's the problem with the test. In Manhart, in Newport News, in Martin Marietta, the comparator test makes perfect sense, because you know exactly what you're testing for, so the comparator helps you draw inferences from the evidence. The problem here is, unless the plaintiffs can point to something outside the comparator to tell us why we need to hold sexual orientation to tell us why that's irrelevant, they're just assuming their conclusion. So their comparator would say, you would ask if a gay man has suffered sex discrimination by comparing him to a heterosexual woman, which that version of the comparator can't isolate if it's the sex or the sexual orientation. And so I do think, unless they can point to something outside the comparator to justify putting sexual orientation off limits, the comparator doesn't answer the ultimate question. Well, it certainly may not answer, isolate, the sole or proximate cause. But I think the argument on the other side is the language of the statute has a but-for causation standard, a more generous causation standard. So perhaps there are two causal factors at work here, but isn't one of them sex in the narrow sense of biological gender? What's your response to that? Yes. So in the — what I'm arguing is simply that sexual orientation standing alone is not, without more, sex discrimination. And so the — I'm sorry, remind me of the question one more time. Sure. So the — your response to Justice Kagan was, I need to focus on sexual orientation because that's the sole or primary causal factor here for the firing. And I think the response from the other side is, but the statute has a more generous causal formulation, a but-for causal formulation. So perhaps you're right that at some level sexual orientation is surely in play here. But isn't sex also in play here because of the change of the first variable? Right. So I think— And isn't that enough? You know, the statute talks about a material causal factor or some formulation like that, not the sole cause, not the proximate cause, but a cause. And one wouldn't — in what linguistic formulation would one say that sex, biological gender, has nothing to do with what happened in this case? Yes, Your Honor. So what you're referring to, I believe, is the motivating factor language. And so in what I just referred to as the sort of benchmark scenario, sex would not be a motivating factor there. If you look at Mr. Bostock's complaint, for example, and you strip out any mention of his sex as being a man — again, we dispute the allegations, of course, but it would still make perfect sense. But if you stripped out any reference to his sexual orientation, it would make little, if any, sense. And so in Price Waterhouse, this Court helped give guidance about how to do the motivating factor analysis and said, imagine you gave the employer truth serum and said, what were your true reasons for doing this? Would one of them be the characteristic? And in what I would call that benchmark scenario, sex would not be— Wouldn't the employer maybe say it's because this person was a man who liked other men? And isn't that first part sex? Your Honor, I think in common parlance, we would call that a same-sex attraction. And I want to be clear. If there is some reason to think that employer — and some of the amicus briefs say that much discrimination against gay and lesbian people is based on sort of animus against gay men or lesbian women. If there is some reason to believe that in that scenario, then that may well be a motivating factor. But when you simply have an employee saying, I was fired because of my sexual orientation, that alone does not show that — what this Court called a non-cal, the critical issue of distinguishing between men and women. Are you drawing a distinction between the literal meaning of because of sex and the ordinary meaning of because of sex? And if so, how are we supposed to think about ordinary meaning in this case? I don't see a difference between the two as far as — and the last point, running out of time, I think to go back to some of the questions about bathrooms and fitness standards, I want to be clear. Under the Plaintiff's simple but-for test, if you truly simply apply the Manhart test or — in the way they want to do it, I don't see any way that single-sex bathrooms or showering facilities or fitness — Ginsburg. You have to have someone who's injured. You have to have someone who's injured. And the response to the bathrooms is, who is the complaining plaintiff? And for most people, they would not be complaining plaintiff. They would not be ill because they're not injured by the separate bathrooms. In fact, they like it. Yes, Your Honor. Although, of course, if someone, for example, is fired, imagine a factory with hazardous materials where people shower after work and to — to clean up, and a man used the women's bathroom and is fired. That person would certainly be injured. And I think under my friend's test, they would say, just change the sex, and that person wouldn't have been fired. But here's the problem. That's not a similarly situated person. The proper analysis would say that a neutral policy, such as use the showering facility that corresponds to your biological sex, the man who uses the women's shower, the comparator is not a woman who uses the women's shower. It's a woman who uses the men's shower, because otherwise you're not — otherwise you're loading the dice or you're not looking at similarly situated people. And the last thing I'd like to get into is this Court in Espinoza, footnote 2. I think there was some discussion of the States early on. In Espinoza, in interpreting national origin discrimination, this Court said that the State practice, interpreting parallel laws, is highly instructive. And so I — I think the fact that 22 or 23 States have done this by legislation and zero have done it by judicial interpretation just shows that this isn't belt and suspenders. It's not just redundancy, that sex and sexual orientation, both in 1964 and today, are different concepts that mean different things, and common users of language, both today and in 1964, would have recognized that. Sotomayor Can they ever be? I'm sorry? Sotomayor Can they ever be? Justice — Justice, Judge Lynch below said that homophobic stereotypes are unrelated to sexual orientation. The very first case before us shows that that's just not true, that homosexual orientation is highly correlated to people's stereotypes. If you're too effeminate a man, you're a homosexual. If you're too matcha a woman, you're a lesbian. Happens all the time. So I find it somewhat difficult to unwind the two. If not difficult, nearly impossible. It often is, Your Honor, and it's a sad reality that homophobic slurs are often directed at heterosexual or homosexual people to — And that's okay under your theory. It is absolutely not, Your Honor, if that person can show discrimination because of sex. But what the courts can't do is what the Second Circuit did and the Seventh Circuit did in Hively. Footnote 11 of the Zarda opinion is very candid about this, where it talks about operationalizing its holding. The Second Circuit is just going to change the jury instructions to tell juries that if they find sexual orientation discrimination, they've now found sex discrimination. So, Justice Sotomayor, I don't disagree that there will be difficult cases at the margins, but the answer is not to change the ultimate inquiry and replace it with something that Congress never could have intended. Well, if you have a minute, let me ask you this. Let's imagine that the decisionmaker in a particular case is behind the veil of ignorance and a subordinate who has reviewed the candidates for a position says, I'm going to tell you two things about this candidate. This is the very best candidate for the job, and this candidate is attracted to members of the same sex. And the employer says, okay, I'm going — I'm not going to hire this person for that reason. Is that discrimination on the basis of sex, where the employer doesn't even know the sex of the individual involved? May I? Yes, please. That would not be discrimination on the basis of sex. And I think that's exactly right. If you get a resume that has a name that could be male or female and there's something on there suggesting that the person is gay and they're not hired for that reason, that would be sexual orientation discrimination that has absolutely nothing whatsoever to do with sex discrimination. Thank you, counsel. General Francisco. Mr. Chief Justice, and may it please the Court. The issue is not whether Congress can or should prohibit employment discrimination because of sexual orientation. The issue, rather, is whether it did so when it prohibited discrimination because of sex. It did not for two reasons. First, sex means whether you're male or female, not whether you're gay or straight. So if you treat all gay men and women exactly the same regardless of their sex, you're not discriminating against them because of their sex. Second, any doubt is removed by the history of Title VII and related statutes, since in the face of unanimous interpretation by the courts and the executive branch that persisted for decades, Congress has repeatedly extended other statutes to specifically cover sexual orientation, yet has refused to do so with respect to Title VII. The employee's position would nullify that conscious choice. And, Justice Gorsuch, if I could first address your question about my friend on the other side's argument about the literal meaning of the statute. Well, there are essentially two responses to that argument, and they're related. The first is that under that interpretation, you actually couldn't fire a man for using the woman's restroom, because in some metaphysical sense, that man's sex is a but-for cause for his firing. The reason that the reason that the reason that the reason that the reason that the  Yeah, and the reason why that's permitted, though, to do that is because you're treating, and this is my second point, you're treating him the same as a similarly situated woman, that is, a woman who uses the men's room. And that's always the critical analysis when you're trying to determine if somebody  The airline's defense is, whatever we're doing, it's not sex discrimination against women, because we don't hire any men at all. So that's a great point.  is not sex discrimination, the gentleman is not married or unmarried. In that case, I take it from your brief, you would say there's no violation of Title VII. Well, no, Your Honor, because I think the problem is that the prohibition on hiring any male flight attendants would in and of itself violate Title VII. But the male is not complaining. The complainant is the woman who was fired because she married. Okay. So then the male complainant might have a very good case, but my case is the woman. Right. And my problem with the hypothetical is that the way it's constructed, there is, you know, presumably no men that have the job in the first place. Now, if you say that, in theory, men should be able to have the job, then the question would be would you also have fired men who were married. And if you only fired women who were married but not men who were married, that would plainly be a violation of Title VII because you're treating similarly situated people differently. But to finish my answer to Justice Sotomayor. That's an impossible idea to put into practice by taking out the sex. May I just continue with it? Yes, Your Honor. The hypothetical is not hypothetical. It's Sprogas against United Airlines. And it was given and not challenged that they didn't hire men as cabin attendants. Right. But they fired this woman because she married. Because she didn't look like Cheryl Fleming. Right. Once she married, she wouldn't be attracted to the male passengers. The Court of Appeals said Title VII was meant to strike out the entire spectrum of sex stereotyping. So if this woman was fired because she wasn't, she would no longer be so attractive to men if she was married. That's sex discrimination. And we don't have to have a male involved. This is a woman who was treated in a very stereotypical way. She is no longer young and attractive when she married. Your Honor, I do think that the question is always are you treating similarly situated men and women differently. There are times where issues of proof are very difficult. For example, in the Price Waterhouse case, Ann Hopkins was fired because she was aggressive, because she was rude to staff. But this was an actual case. This was an actual case, and it was given that no males are hiring and no male is complaining. But, Your Honor, the way that actual case was resolved was because the woman had not brought her claim in a timely fashion on the sex discrimination piece. And so the way this Court resolved that decision was it said, all right, she's being treated the same. This case never came to this case, never came to this case. Oh, all right. Then I guess I'm thinking of the wrong case. Sprogas v. United Airlines, Seventh Circuit. General, could I go back to your opening statement, and particularly to the second part of it? You talked about the history of Title VII and some of the subsequent legislative history. And I guess what strikes me, and I was struck in reading your briefs, too, is that the arguments you're making, I would say, are not ones we typically would accept. For many years, the lodestar of this Court's statutory interpretation has been the text of a statute, not the legislative history, and certainly not the subsequent legislative history. And the text of the statute appears to be pretty firmly in Ms. Carlin's corner. Did you discriminate against somebody, against her client because of sex? Yes, you did, because you fired the person because this was a man who loved other men. And part of that, and it only has to be part, we've made very clear there's no search for sole cause in Title VII. Part of that is you fired the person because he was a man. If he were a woman, he wouldn't have been fired. This is the usual kind of way in which we interpret statutes now. We look to laws. We don't look to predictions. We don't look to desires. We don't look to wishes. We look to laws. Why doesn't that mean your argument failed? Because, Your Honor, I think that what our brief attempts to do, at least, is make a straightforward textual argument. The law distinguishes between sex and sexual orientation. Those are two different traits. And that's precisely why when Congress wants to prohibit discrimination based on sexual orientation, it doesn't define sex as including sexual orientation. It lists it as a different trait. And so under Title VII. The two-comparator problem we've been discussing and the fact that at least one contributing cause appears to be sex. Well, Your Honor, a couple of responses. First, I don't think that one contributing cause is sex. I think that as long as you're treating gay men and women exactly the same regardless of their sex, the contributing cause is sexual orientation, not sex. And, two, I think it reflects the fact that sex and sexual orientation are different traits, and if you do the analysis the way my friends on the other side suggested, you've completely eliminated the distinction between two very different traits. And you've essentially rendered, you've nullified Congress's very careful decisions in numerous other statutes to specifically protect sexual orientation and gender identities. We'll get to that in the next case. Ginsburg. Is there anything in this record showing that the employers would not employ lesbian women? You know, Your Honor, in these cases, and this may have been a better question for my colleague, but I think in these cases, the employers have denied the cases, the sexual orientation cases, the employers have generally denied that they discriminate based on sexual orientation. Ginsburg. Did this go? The allegation is that the person was discharged when he announced that he was gay. There's nothing in the record, as far as I can see, that there was a policy on the employer's part of discharging or not hiring lesbian women. Right. I think that's right. I think basically the employer's defenses here were, one, I didn't fire him because he was gay, but, two, if you think I did, Title VII doesn't prohibit discrimination based on sexual orientation. And if I could address, lastly, the point that the Chief Justice and Justice Alito were raising about so-called legislative updating that Judge Posner suggested here, I think that a judicial ruling would be particularly pernicious, because when Congress seeks to expand the scope of Title VII's liability provisions, it typically couples that itself with an expansion of the religious employer's exemption to Title VII, precisely because issues of sexual orientation, like issues of gender identity, raise different issues from a religious liberty perspective. The employee's position here would only do half of that work. It would expand the scope of liability without giving any consideration to those that is better left to Congress than the courts. Justice Gortz, I want to make sure that I fully address your textual considerations though, because I really do think it boils down to the fact that sex and sexual orientation are different traits. May I finish my answer? Sure. Title VII prohibits discrimination based on one of those traits. As long as you treat men and women who are similarly situated with respect to the other trait exactly the same, you're not, quote, unquote, discriminating under, within the meaning of Title VII. Thank you, counsel. Thank you. Five minutes, Ms. Carlin. Thank you. Let me start with the question that Justice Ginsburg asked, because I think it's illustrative of contemporary sexual orientation discrimination cases. Virtually none of them involve an employer, and neither of the cases before you does who claims to have an across-the-board policy of firing both all gay men and all lesbians. What tends to happen, and this case is illustrative of this, is a man who also doesn't conform with some other gender-based stereotypes and who is gay gets fired, which puts them in exactly the position that Justice Sotomayor mentioned, which is really devilishly hard to figure out what's going on here. The second point I just want to leave the Court with is the entire argument on the other side depends on the idea that men who are gay and women who are lesbians are being treated the same, and that's just not so, because if you look at what actually causes the problem, it's the man who says, I married my partner, Bill. If any woman who worked there had married Bill, he would not been fired, and he is. And you have to look, because the textual language tells you to, at such individual and not at the overall class. Sotomayor, Ms. Carlin, would you address the General's statement at the end? He goes back to the comparator should be a woman who – a man who likes a man and a woman who likes a woman. You're trying to get to that. Yes. I think he is varying two things there. One, he's varying the sex of the employee, and second, he's varying the sex of the person to whom the employee is interested. And if two things, the person – So give us an example from a case how you can't do that. I'm not sure – of course, you can do it, but you don't have to, because all you need to do is show that sex played a role here. And if the answer is, if a man had – if a woman had come in and said, I like to date men, you wouldn't have fired her, and when a man says, I like to date men, you did, that's enough to show sex discrimination. Well, what if the decisionmaker makes a decision based on sexual orientation but does not know the biological sex of the person involved? Well, there is no reported case that does that, and I think the Court can wrestle with – All right. But what if it happened? We've had a lot of hypotheticals of things that may or may not have happened. What if that happens? Is that discrimination on the basis of sex where the decisionmaker doesn't even know the person's sex? And how do they know the person's sexual orientation? Because somebody who interviewed the candidates tells them that. And they're unable to tell anything about the person's sex. No. So this is Saturday Night Live Pat as an example, right? Well, I'm not familiar with that. Okay. Which is the person named Pat, and you can never tell whether Pat is a man or a woman. I mean, theoretically that person might be out there. But here's the key. Theoretically what? Theoretically that person might be out there. But here's the key. The cases that are brought are almost all brought by somebody who says, my employer knew who I was and fired me because I was a man, or fired me because I was a woman. Somebody who comes in and says, I'm not going to tell you what my sex is, but believe me, I was fired for my sexual orientation, that person will lose. Well, if that's the case, then I think your whole argument collapses. Because sexual orientation, then, is a different thing from sex. Of course it is. No one has claimed that sexual orientation is the same thing as sex. What we are saying is when somebody is fired for – Let me amend that. Your argument is that discrimination based on sexual orientation necessarily entails discrimination based on sex. But if it's the case that there would be no liability in the situation where the decision maker has no knowledge of sex, then that can't possibly be true. If there was that case, it might be the rare case in which sexual orientation discrimination is not a subset of sex. But in the case where the person knows the sex of the person that they're firing or refusing to hire, and knows the sex of the people to whom that person is attracted, that is sex discrimination, pure and simple. And it's important to understand that – and this goes back to something that Justice Ginsburg asked during the opening argument – that discrimination against gay men and discrimination against lesbians is not one thing. And in 1964, if you look at the members of Congress' brief, they will tell you if you looked in the dictionary, there was no phrase sexual orientation. That is a modern way of combining two kinds of discrimination. Discrimination against gay men, which goes back to Leviticus and the common law, and discrimination against lesbians, which was not part of Leviticus and was not part of the common law. Indeed, in 1964, there were only 16 states in the United States that clearly forbid some act in which lesbians could engage. So the idea that this is one large idea about sexual orientation discrimination in the abstract without reference to sex simply birks the history and birks the understanding. And if you look at the harassment cases, you will see why this is true. Gay men are harassed in a different way than lesbians. Thank you. Thank you, counsel. The case is submitted.